IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 10-503 |
| v. ) | |
| ) | |
| DICO, INC. and ) | |
| TITAN TIRE CORPORATION, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

1. The United States of America, by authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA") files this complaint and allege as follows:

## NATURE OF THE ACTION

2. This is a civil action brought pursuant to Sections 106, 107 and 113(g) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9606, 9607 and 9613(g), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("CERCLA"). The United States seeks civil penalties pursuant to 42 U.S.C. § 9606, punitive damages pursuant to 42 U.S.C. § 9607(c)(3), and the recovery, pursuant to 42 U.S.C. § 9607(a), of unreimbursed response costs incurred, and to be incurred, in response to releases and threatened releases of hazardous substances into the environment at and from the Southern Iowa Mechanical ("SIM") Site in

Ottumwa, Iowa.  The United States also seeks a declaratory judgment pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), holding the defendant liable for all future response costs that will be binding in any subsequent action or actions to recover further response costs incurred by the United States or the State at or in connection with the SIM Site.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter of this action pursuant to Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), and 28 U.S.C. §§ 1331 and 1345.

4. Venue is proper in this district pursuant to Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), and 28 U.S.C. § 1391(b) and (c) because the claims arose and the threatened and actual releases of hazardous substances occurred in this district.

## DEFENDANTS

5. At times relevant hereto, each Defendant arranged for the disposal of hazardous substances within the meaning of  42 U.S.C. §§ 9607(a)(1) and (a)(3).

6. Defendant Dico, Inc. ("Dico") is a corporation organized and existing pursuant to the laws of the State of Delaware and doing business in this district.

7. Defendant Titan Tire Corporation ("Titan") is a corporation organized and existing pursuant to the laws of the State of Illinois and doing business in this district.

8. At all relevant times, each Defendant was a "person" within the meaning of 42 U.S.C. § 9601(21).

**STATUTORY BACKGROUND**

9. CERCLA was enacted in 1980 to provide a comprehensive mechanism for abating releases and threatened releases of hazardous substances and other pollutants and contaminants and for funding the costs of such abatement and related enforcement activities, which are known as "response actions." 42 U.S.C. §§ 9604(a), 9601(25).

10. CERCLA authorizes the President to undertake a response action whenever a "hazardous substance is released or there is a substantial threat of release into the environment" or when the release or threat of release may present an imminent and substantial danger to the public health or welfare. 42 U.S.C. § 9604(a)(1).

11. In addition, when the President determines that there may be an imminent or substantial endangerment to the public health or welfare because of an actual or threatened release of hazardous substances, the United States may take such actions as may be necessary to protect the public health and welfare and the environment. The President is specifically authorized to "issu[e] such orders as may be necessary to protect public health and welfare and the environment." 42 U.S.C. § 9606(a).

12. For CERCLA response actions and enforcement purposes, the Administrator of EPA is the President's delegate, as provided in operative Executive Orders, and, within certain limits, the Regional Administrators of EPA have been re-delegated this authority.

13. CERCLA provides that any "person who, without sufficient cause, willfully violates, or fails or refuses to comply with, any order of the President under subsection

(a) of this section may, in an action brought in the appropriate United States district court to enforce such order, be fined not more than $25,000 for each day in which such violation occurs or such failure to comply continues." 42 U.S.C. § 9606(b)(1).

14. Pursuant to the Debt Collection Improvement Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321, the maximum civil penalty for noncompliance with an administrative order occurring after March 15, 2004, is $32,500.

15. CERCLA also provides that "any person who by contract, agreement, or otherwise arranged for disposal or treatment . . . of hazardous substances owned or possessed by such person . . . ." shall be liable for "all costs of removal or remedial action incurred by the United States Government . . . not inconsistent with the national contingency plan."  42 U.S.C. § 9607(a).

16. CERCLA further provides that any person who is liable for a release or threat of release of hazardous substances who fails to comply with an order pursuant to 42 U.S.C. § 9606 may be liable to the United States "for punitive damages in an amount at least equal to, and not more than three times, the amount of any costs incurred by the Fund" as a result of the failure to comply with the order.  42 U.S.C. § 9607(c)(3).

**GENERAL ALLEGATIONS**

17. This case involves the disposition of certain PCB contaminated beams and insulation from buildings, commonly referred to as Buildings 3, 4 and 5, on the Dico property within the boundaries of the Des Moines TCE Superfund Site in Des Moines, Iowa.

18. In the 1960s and 1970s, DiChem used Buildings 3, 4 and 5 for chemical and product storage in connection with its pesticide and herbicide formulation activities.

19. After formulation activities ceased in the late 1970s, Dico began to use the buildings for warehousing.  By the late 1980s, the buildings were in a serious state of disrepair.

20. As part of the cleanup of the Des Moines TCE Site, EPA ordered Dico to conduct a remedial investigation in the early 1990s.  Dico retained Eckenfelder, Inc. as its contractor to do the sampling and evaluations required by the order. In this investigation, Dico's contractor found a variety of contaminants in Buildings 3, 4 and 5. This investigation revealed the presence of PCBs in the insulation of these buildings.

21. On July 11, 1993, the Raccoon River flooded the Dico Property within the Des Moines TCE Site and surrounding areas.  Flood waters inundated the site, including Buildings 3, 4 and 5.  Flood waters reportedly reached depths of from one to six feet and remained on the Site for approximately 7 to 10 days.  Dico's office building was totaled and its wheel manufacturing capabilities were severely impacted.

22. Shortly after the 1993 flood, Titan Wheel International, now Titan International, Inc. ("TII"), acquired Dico's parent, the Dyneer Corp.  Titan Wheel indicated to EPA that it wanted to return the Dico Property to usable condition but that substantial building cleaning and renovation would be necessary before the buildings could be reoccupied.

23. In March 1994 EPA issued a Unilateral Administrative Order for Removal Action to Dico requiring Dico to submit a work plan for cleaning the buildings and

adjacent soils consistent with EPA's comments and, upon EPA's approval of the work plan to, *inter alia*, repair, seal and protect the building insulation. EPA commonly refers to this as the Building UAO.

24.     Among other things, the Building UAO required Dico to repair and encapsulate in place the contaminated insulation in Buildings 3, 4 and 5.  Insulation that was in too poor condition to be repaired was removed and disposed of in accordance with federal PCB disposal requirements.  A coating of epoxy paint was placed over the insulation to encapsulate the PCBs.  In 1994, Dico completed encapsulation of the walls and ceilings in Buildings 3, 4 and 5.

25.     The Building UAO required Dico to maintain the encapsulation.  That order remains in effect today.

26.     Dico developed an "Operation and Maintenance Plan" as required by the Building UAO.  This plan provided the measures to be taken to ensure continued effectiveness of the encapsulation, including taking steps to prevent equipment from scratching or damaging the encapsulation.  The plan required Dico to repair scratches or abrasions in the coating when they occurred.  In addition, the plan required Dico to contact EPA if more significant damage to the coating occurred.  The plan provided that if there was structural damage to the buildings, Dico was to contact EPA for guidance.

27.     Long-term operation and maintenance requirements also included periodic inspection of the insulation, sampling the air within the buildings to make sure safe levels of contaminants were being attained, sampling the surfaces of the floors and insulation to verify that the encapsulation layer was preventing release of PCBs and

pesticides, and reporting the findings of the inspections and sampling data to EPA on an annual basis.

28. By letter dated May 8, 1997, EPA notified Dico that the building cleaning and encapsulation work had been completed and that the long-term operation and maintenance plan ("O&M Plan") were now in effect.

29. Dico submitted annual reports to EPA for most years from 1997 until 2005.

30. In these years, Dico used the buildings for warehousing but it never resumed wheel manufacturing.

31. Dico's use of the buildings diminished over time. In its 2002 Building Removal Action Annual Report Dico indicated that "the buildings are not inhabited by employees." By letter dated July 2, 2003, Daniel Buttars, Dico's Environmental Coordinator, Dico sought EPA's permission to stop monitoring Building 4, arguing that the buildings were not being actively used.

32. In that letter, Dico stated that it had "intentions of possible future demolition or dismantling of these buildings. No date of certainty can be given for this, however." Dico asked to discontinue the operation and maintenance requirements because "the buildings are not being used for manufacturing activities, the cost associated with the upkeep, and there is no occupancy of people to perform the work."

33. EPA denied Dico's proposal by letter dated September 3, 2003, and stated that, while EPA did not necessarily object to demolition of the building, Dico was required to "coordinate any plans for demolition of the buildings with EPA. Certain

disposal requirements may apply for building debris, and the EPA or state would want to oversee the demolition."

34. By 2005, the buildings were again in very poor condition. Dico's Building Removal Action Annual Report from July 2005 stated that the buildings "remain unoccupied for any manufacturing or warehousing activities. The entire inventory has been moved out." Dico also reported it was maintaining perimeter fencing and locked gates, "as well as twenty-four hour onsite security services are scheduled to return to the premises to discourage vagrants and/or trespassers."

35. In July 2007, Titan Tire, on behalf of Dico, arranged with Southern Iowa Mechanical ("SIM") to dismantle certain buildings on the Dico Property, including Buildings 3, 4 and 5. Dico explains Titan Tire's involvement by stating that Dico had no employees in the Des Moines area. Therefore, Dico asked a Titan Tire official to make the arrangements for demolition of the buildings.

36. SIM is primarily a mechanical contractor which had an ongoing business relationship with Titan Tire.

37. Neither Dico nor Titan Tire informed SIM that the buildings were contaminated with PCBs or that Dico was subject to an order requiring it to maintain the encapsulation of the contaminated insulation.

38. The building demolition took place between August and November 2007. SIM stated that the buildings were "taken down using scissor lifts, forklifts, cutting torches and chop saws." SIM hired approximately 50 people to work on the building demolition.

39.     Various parts of the buildings were disposed of in different ways. Aluminum siding was reportedly recycled at a local recycling center.  The general demolition debris, including most of the PCB contaminated insulation, lighting fixtures, doors, and miscellaneous materials, were disposed of at the Metro Park East Landfill in Mitchellville, Iowa, just east of Des Moines.

40.     The demolition of the buildings was in violation of the Building UAO, including at least:

- Paragraph 29.c. which required a plan to "[r]epair, seal and protect all building insulation and seal all exposed interior surfaces . . . to ensure a sufficient and durable layer of protection that prevents direct contact exposures and requires minimum maintenance to preserve the seal integrity."
- Paragraph 32 which required implementation of the plan required by Paragraph 29 once it was approved by EPA.
- Paragraph 31 which required "a plan for post-removal site control" that "present[ed] actions necessary to ensure the protectiveness and integrity of the interior surface sealing, encapsulation of all building insulation . . . ." and required Dico to implement the plan upon approval by EPA.

41.     SIM transported the steel structural beams from the buildings to its facility in Ottumwa, Iowa.  The beams were placed in several piles in an open area on the SIM facility.

42.     On September 19, 2007, Mary Peterson, the EPA Region 7 Remedial Project Manager ("RPM") for the Des Moines TCE Site, visited the Dico Property as part of an on-going Five Year Review for the Des Moines TCE Site.  At the time of this visit large portions of the buildings had already been dismantled and essentially all the insulation had been removed.

43.     After the site inspection, EPA sent Dico a letter dated November 7, 2007, asking for additional information about various activities observed on the Dico Property during the September 19 inspection, including the building demolition.

44.     Dico responded by letter dated January 22, 2008.  Dico acknowledged that it had not notified EPA of the demolition.

45.     When EPA inspected the SIM property, it found multiple piles of structural steel of various sizes and shapes covering an area of approximately three-quarters of an acre.

46.     On May 16, 2008 EPA sampled beam surfaces, the soil beneath the beams, and residual bulk insulation found on the beams.  Results of this sampling showed PCB concentrations substantially above acceptable levels.

47.     There were and are "releases," as defined at Section 101(22) of CERCLA, 42 U.S.C. § 9601(22), and the threat of continuing releases, of "hazardous substances," as defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), into the environment at the SIM Site.

48.     The SIM Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

49. On December 30, 2008, EPA issued an administrative order directing Dico and Titan Tire to remove and property dispose of the contaminated soils and beams.

50. Dico and Titan Tire complied with that order and EPA determined the removal action was complete in October 2009.

51. EPA incurred at least $94,000 in response costs related to the release or threatened release of hazardous substances at the SIM Site.

52. The releases and threatened releases of hazardous substances at the Site caused the United States to incur costs of "response" within the meaning of Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).

**FIRST CLAIM FOR RELIEF**
**(Against Both Dico and Titan for Recovery of Response Costs)**

53. The preceding allegations are included in this claim for relief.

54. CERCLA provides that, "[n]otwithstanding any other provision or rule of law, and subject only" to the statutorily defined defenses ""any person who by contract, agreement, or otherwise arranged for disposal or treatment . . . of hazardous substances owned or possessed by such person . . . . shall be liable for  . . . all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan . . . ." 42 U.S.C. § 9607(a)

55. Dico and Titan are each a "person" within the meaning of 42 U.S.C. § 9601(21) and persons who arranged for disposal or treatment of a hazardous substance within the meaning of 42 U.S.C. § 9607(a).

56.     The United States has incurred response costs in connection with response actions at the Site, pursuant to 42 U.S.C. § 9604.  The United States continues to incur response costs, including enforcement costs associated with the recovery of funds expended in response to the releases and threatened releases of hazardous substances at the SIM Site.

57.     The response actions taken and the response costs incurred by the United States at the SIM Site are not inconsistent with the National Contingency Plan, 40 C.F.R. Part 300.

58.     Dico and Titan are each liable to the United States under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for all response costs incurred by the United States in connection with the Site.

**SECOND CLAIM FOR RELIEF**
**(Against Dico for Civil Penalties)**

59.     The preceding allegations are included in this claim for relief.

60.     CERCLA provides that any "person who, without sufficient cause, willfully violates, or fails or refuses to comply with, any order of the President under subsection (a) of this section may, in an action brought in the appropriate United States district court to enforce such order, be fined not more than $25,000 for each day in which such violation occurs or such failure to comply continues." 42 U.S.C. § 9606(b)(1).

61.     Pursuant to the Debt Collection Improvement Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321 ("DCIA"), the maximum civil penalty for noncompliance with an administrative order occurring after March 15, 2004, is $32,500.

62. Dico violated the terms and conditions of the Building UAO, EPA Docket No. VII-94-F-0017, by arranging for the demolition of Buildings 3, 4, and 5 on the Dico property and thereby arranging for the breach of the encapsulation of the insulation without notifying EPA and complying with the requirements of its Operation and Maintenance Plan.

63. Pursuant to 42 U.S.C. § 9606(1), and the Debt Collection Improvement Act, Dico is liable to the United States for a civil penalty of up to $32,500 per day for its failure to comply with the Building UAO.

### THIRD CLAIM FOR RELIEF
**(Against Dico for Punitive Damages)**

64. The preceding allegations are included in this claim for relief.

65. CERCLA provides that any "[i]f any person who is liable for a release or threat of release of hazardous substance fails without sufficient cause to properly provide removal . . . action upon order . . . pursuant to section . . . 9606 of this title, such person may be liable to the United States for punitive damages in an amount at least equal to, and not more than, three times, the amount of any costs incurred by the Fund as a result of such failure to take proper action." 42 U.S.C. § 9607(c)(3).

66. As alleged in Paragraph 62, Dico violated the terms and conditions of the Building UAO and thereby failed to properly provide removal action as ordered by EPA.

67. Pursuant to 42 U.S.C. § 9607(c)(3), Dico is liable to the United States for punitive damages up to three times the costs the United States incurred in responding to the release or threat of release of PCBs at the SIM Site.

**PRAYER FOR RELIEF**

WHEREFORE, the United States respectfully requests that the Court:

1. Enter judgment against Dico and Titan jointly and severally, for all response costs incurred by the United States in connection with the SIM Site;

2. Enter a declaratory judgment of liability against Dico and Titan that will be binding in any action to recover further response costs incurred by the United States in connection with the Site;

3. Order Dico to pay a civil penalty of up to $32,500 per day for each day it failed to comply with the Building UAO;

4. Order Dico to pay punitive damages of up to three times the response costs the United States incurred in responding to the release or threat of release of PCBs at the SIM Site.

5. Award the United States its costs in this action; and

6. Grant such other and further relief as is appropriate.

        Respectfully submitted,

        IGNACIA S. MORENO
        Assistant Attorney General
        Environment and Natural Resources Division

        ELLEN M. MAHAN
        Deputy Chief
        Environmental Enforcement Section
        Environment & Natural Resources Division
        United States Department of Justice

        _____
        SARAH D. HIMMELHOCH
        Senior Attorney
        Environmental Enforcement Section
        Environment and Natural Resources Division
        United States Department of Justice
        P.O. Box 7611, Benjamin Franklin Station
        Washington, D.C. 20044-7611
        Telephone: (202) 616-6560
        Fax: (202) 514-4180
        Email: sarah.himmelhoch@usdoj.gov

        NICHOLAS A. KLINEFELDT
        United States Attorney Southern District of Iowa
        U.S. Courthouse Annex, Suite #286
        110 East Court Avenue
        Des Moines, Iowa 50309-2053

OF COUNSEL:

DANIEL SHIEL
Assistant Regional Counsel
U.S. Environmental Protection Agency Region VII
901 N. 5th Street
Kansas City, Kansas 66101