IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| | * | 4:10-cv-00503 |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| DICO, INC. and TITAN TIRE | * | |
| CORPORATION, | * | |
| | * | ORDER ON BENCH TRIAL |
| Defendants. | * | |
| | * | |

This lawsuit arose out of the United States of America's ("Plaintiff") claims against Dico,

Inc. ("Dico" or "Defendant") and Titan Tire Corporation ("Titan Tire") (collectively

"Defendants"), under "Sections 106, 107 and 113(g) of the Comprehensive Environmental

Response, Compensation, and Liability Act ["CERCLA"] of 1980."  Compl. (Clerk's No. 1) ¶ 2.

Plaintiff sought to recover unreimbursed response costs from Defendants, and civil penalties and

punitive damages from Dico, in connection with the release and/or the threat of release of

polychlorinated biphenyls ("PCBs")[1] at Southern Iowa Mechanical's ("SIM") site in Ottumwa,

Iowa.  *See id.*  Plaintiff also requested that the Court enter a declaratory judgment holding

Defendants liable for all future response costs that Plaintiff would incur as a result of the release

and/or threat of release of PCBs at the SIM site.  *See id.*

The Court resolved all but one of the issues presented by the parties during the summary

judgment phase of the litigation.  In particular, the Court held that:  (1) Defendants arranged for

the disposal of PCBs by selling some of its PCB-contaminated buildings to SIM, *see* Order

---

[1]      PCBs are listed as hazardous substances.  *See* 40 C.F.R. § 302.4.

(Clerk's No. 119) at 16–40; (2) Defendants were liable for all response costs that Plaintiff had already incurred or would incur as a result of the SIM site removal action, *see* Order (Clerk's No. 128) at 43; and (3) Dico was liable for both civil penalties and punitive damages for violating the 1994 Unilateral Administrative Order (the "1994 Building UAO"), *see id.* The sole issue reserved for trial was the amount, if any, of civil penalties and/or punitive damages to be assessed against Dico. *See id.* The Court held a bench trial on this issue from December 2–5, 2013. *See* Clerk's Nos. 186–89. On January 15, 2014, the parties submitted their proposed findings of fact and conclusions of law. *See* Clerk's Nos. 196–97. The matter is fully submitted.

## I. CONSIDERATIONS ON REVIEW

Federal Rule of Civil Procedure 52(a) requires that in all cases tried without a jury or with an advisory jury, "the court must find the facts specially and state its conclusions of law separately." In determining the credibility of the witnesses and the weight to be accorded their testimony, the Court has taken into consideration: the character of the witnesses, their demeanor and manner of testifying on the stand, their interest, if any, in the result of the trial, their relation to or feeling toward the parties to the trial, the probability or improbability of their statements, and all other facts and circumstances given in evidence. *See United States v. Phillips*, 522 F.2d 388, 391 (8th Cir. 1975); *Clark v. United States*, 391 F.2d 57, 60 (8th Cir. 1968); *United States v. Earles*, 983 F. Supp. 1236, 1254 (N.D. Iowa 1997); Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit, Instruction 3.03 (2013). With these considerations in mind, the Court finds facts and makes conclusions of law as articulated herein.

## II.  FINDINGS OF FACT

### A.  *Stipulated Facts*

The parties have stipulated to many of the facts in this case.  *See* Am. Proposed Order on

Final Pretrial Conference (Clerk's No. 181) at 2–6.  Pursuant to this stipulation, the Court finds

the following facts:

- Dico is a corporation organized and existing pursuant to the laws of the State of Delaware.

- Dico owns property located at 200 Southwest 16th Street in Des Moines, Iowa, which is part of the Des Moines TCE Superfund Site.

- The Des Moines TCE[2] Superfund Site is divided into four Operable Units ("OU").

- OU1 involves a groundwater extraction, treatment, and monitoring system designed to address historical volatile organic compound contamination in the groundwater on the Dico property.

- OU3 involves groundwater in the area north of the Dico property.  Dico does not own the land at issue in OU3.

- OU2 and OU4 include several buildings on the Dico property where, among other things, formulation of pesticides and herbicides once occurred.  OU4 also includes soil and sediment associated with an aldrin tank that once existed on the property; the South Pond area; and a drainage channel south and east of the Dico property.  As part of the remedial work associated with OU4, Dico installed an asphalt cap over a substantial portion of the Site.  To this day, Dico is responsible for maintaining the asphalt cap.

- In 1992, PCBs were discovered in the insulation of five buildings (Buildings 2–5 and the Maintenance Building, collectively the "Dico Buildings") on Dico's property within what is now OU4.

- [The Environmental Protection Agency] [("the] EPA[" or the "Agency")] issued . . . the 1994 Building UAO to Dico to address contamination within the Dico Buildings.  The 1994 Building UAO did not cover certain other buildings on the

---

[2]       "TCE" refers to trichloroethylene, which was the main contaminant in the groundwater at the Dico site.  *See* Trial Tr. at 36:18–21.

Dico property, including the Weld Shop and [the] Production Building.

• Dico performed the work set forth in the approved Removal Action Work Plan required by the 1994 Building UAO and submitted a final report to [the] EPA on April 11, 1997 ("the 1997 Report"). . . .

• Mary Peterson [("Peterson")], [the] EPA's project manager for the Dico Site, reviewed and approved the 1997 Report.

• On May 8, 1997, [the] EPA issued a notice of completion approving the 1997 Report and noting that "the continuing obligations" of the . . . [1994 Building UAO] remained in effect. . . .

• Dico prepared and revised the [Operations and Maintenance Plan] [("O&M Plan")] pursuant to [the] EPA's directions in accordance with Paragraph 31 of the 1994 Building UAO, and submitted the revised O&M Plan to [the] EPA for approval on June 10, 1994.

• [The] EPA approved the June 10, 1994 O&M Plan on February 5, 1997.

• In December 2002, Dico wrote a letter to . . . Peterson regarding proposed modifications to the OU1 groundwater treatment and monitoring system, and raised the possibility of modifying the O&M Plan applicable to the Dico Buildings. Dico and [the] EPA exchanged additional communications, including a draft work plan, regarding these modifications in subsequent months.

• On July 2, 2003, Dan Buttars, on behalf of Dico, sent a letter to . . . Peterson providing a revised "Work Plan for Proposed Modification of Des Moines TCE Site." The July 2, 2003 revised Work Plan included a statement that Dico "has intentions of possible future demolition or dismantling of these buildings. No date of certainty can be given for this however." [The] EPA and Dico exchanged additional letters in subsequent months.

• On September 3, 2003, [the] EPA wrote a letter to Dico in which it approved the modifications to the O&M Plan applicable to the Dico Buildings. The letter also acknowledged that "[t]he Work Plan mentions that Dico may demolish the buildings which are associated with previous response actions and subject to certain requirements for operation and maintenance." The letter further stated that [the] EPA "does not necessarily object to demolition of the buildings, but urges Dico to coordinate any plans for demolition of the buildings with [the] EPA." *The letter further stated that "certain disposal requirements may apply for building debris, and the EPA or state would want to oversee the demolition."* (emphasis added).

• On September 23, 2003, Dico sent a letter responding to [the] EPA's September 3,

4

2003 letter, in which it stated that "Dico will notify EPA by phone and writing at least one week prior to any future site activity regarding building dismantling or demolition, improvements, and/or re-use."

- Beginning in May 2007, Titan Tire, on behalf of Dico, entered into three transactions with SIM concerning the Dico Buildings: two contracts for the Maintenance Building and the western annex of Building 3, and one contract for Buildings 4 and 5 and the north end of the Production Building. SIM paid $1.00 per square foot for these buildings.

- Buildings 1 and 2 and the remainder of Building 3 were not part of the transactions in 2007 and remain on the Dico property.

- The Dico Buildings that were the subject of Titan Tire's transactions with SIM were steel-beamed, Butler-style buildings.

- SIM began dismantling the first of the Dico Buildings it purchased (the Maintenance Building) no earlier than June 19, 2007.

- [The] EPA discovered that the buildings were being dismantled during the five-year review site inspection on September 19, 2007. . . . The dismantling was not complete on that date.

- SIM finished removing all remaining building materials and debris from the Dico site no later than November 27, 2007.

- SIM took the steel beams from the buildings to its property in Ottumwa, Iowa.

- In May 2008, [the] EPA tested samples from the steel beams, from soil near the beams, and from a large piece of insulation that was found between several beams, and confirmed that PCBs were present on some of the beams, in the soil, and in the sampled insulation.

- [The] EPA issued a Unilateral Administrative Order [("UAO")] to Dico and Titan Tire requiring them to perform a removal action at the SIM [s]ite, which became effective on January 23, 2009 (the "SIM Site [UAO]").

- Dico and Titan Tire performed the work required by [the] EPA at the SIM [s]ite in accordance with the SIM Site UAO.

- On June 1, 2010, [the] EPA issued a "Notice of Completion" letter to Dico and Titan Tire for the work required under the SIM Site UAO.

- Dico is subject to two Administrative Orders in addition to the 1994 Building UAO

5

. . . . They pertain to groundwater for OU1 (issued in 1991) and soil remediation for OU4 (issued in 1994).   Dico has performed the groundwater treatment and monitoring required of it by the Administrative Order and associated . . . [O&M] Plan for OU1.  Dico has maintained the asphalt cap pursuant to the Administrative Order and associated . . . [O&M] Plan for the asphalt cap for OU4.  SIM's removal of the [Dico] [B]uildings did not affect the integrity of the asphalt cap.

*Id.* ¶¶ 1–29.

## B.  *Additional Findings of Fact*

Although the parties did not stipulate to the facts that follow, the Court finds that they

have been amply proven or established by testimony and other evidence at trial.

### 1.     *Nature of Dico's conduct.*[3]

- James Fechter ("Fechter") was employed as corporate environmental engineer by Titan International from 1993 to 1998.  Ex. 1149 (Fechter Dep.) at 8:18–20, 10:15–18.  In that capacity, he was responsible for, among other things, Dico's environmental compliance at its Des Moines, Iowa facility.[4]  *Id.* at 11:12–23.

- Fechter understood that the 1994 Building UAO sought to remedy PCB contamination.  *Id.* at 28:23–29:2.  He testified that PCBs were present in the ceiling and wall insulation inside the Dico Buildings.  *Id.* at 29:13–30:3.

- Fechter oversaw the removal action undertaken pursuant to the 1994 Building UAO, and was

---

[3]     As discussed *infra* § III.A, the Court considers five factors to determine the amount of any civil penalty.  For ease of reference, the Court has categorized its factual findings as they bear on each of these factors.  The evidence bearing on Dico's bad faith contained in this subsection represents only a portion of the relevant evidence presented at trial. The Court, however, need not recount the rest of this relevant evidence because the evidence included below is sufficient for the purpose of determining the appropriate penalty amount against Dico.

[4]     Whenever he was carrying out his duties with respect to the Dico site, Fechter was acting on behalf of Dico as its agent.  This same proposition is also true for all other individuals or entities that completed work for Dico's benefit.  *See* Ex. 1151 (Dico Dep.) at 176:2–14, 188:19–189:4 (Gary Schuster testifying on behalf of Dico that if an employee of Titan International or Titan Tire or some other Titan entity was performing work for the benefit of Dico, such employee was acting as Dico's agent).

regularly communicating with Cheri Holley ("Holley")[5] to update her on the status of this removal action.  *Id.* at 42:3–13, 43:21–44:14, 49:18–50:3.

• Fechter understood that PCBs remained inside the Dico Buildings even following the completion of the removal action.  *Id.* at 86:17–87:2.[6]  In fact, the overarching purpose of the O&M Plan, which was required by the 1994 Building UAO, was to ensure the integrity of the paint encapsulating the remaining PCBs inside the Dico Buildings.  *Id.* at 87:18–88:11, 97:12–98:12.[7]

• Fechter testified that the "Notice of Completion" issued by the EPA on May 8, 1997 did not terminate the 1994 Building UAO or the O&M Plan.  *Id.* at 123:23–125:10.[8]

• Holley is Dico's general counsel and the Dico officer in charge of managing all environmental matters related to Dico.  *See* Ex. 1151 (Dico Dep.) at 61:17–62:3, 71:13–21, 74:1–10, 79:12–80:4.  In this capacity, she assigned responsibilities and oversaw the work of the various employees or consultants with respect to Dico's environmental matters.  *See id.*

• Prior to the sale of the Dico Buildings to SIM, Holley received and reviewed a copy of a March 2007 Reuse Planning Report, *see id.* at 179:2–180:6, 180:25–181:6, which clearly stated that the buildings in question still contained PCBs, *see* Ex. 178 at 3, 21.  Brian Mills ("Mills"), an environmental consultant[9] for the Dico site, also received a copy of this

---

[5]     Holley was and still is Dico's general counsel and the Dico officer in charge of managing all environmental matters related to Dico.  *See infra* p. 7.

[6]     The Court overrules Dico's objection to the admissibility of this testimony.  *See* Ex. 1149 (Fechter Dep.) at 86:21–23 (arguing that Plaintiff's question eliciting the testimony at issue was "leading and suggestive" and called for "speculation and conjecture").

[7]     The Court overrules Dico's objection to the admissibility of this testimony.  *See* Ex. 1149 (Fechter Dep.) at 98:1–5 (arguing that Plaintiff's question eliciting the testimony at issue called for a legal conclusion and was also "leading and suggestive").

[8]     The Court overrules Dico's objections to the admissibility of this testimony.  *See* Ex. 1149 (Fechter Dep.) at 124:19–22, 125:6–7.

[9]     In addition to being an environmental consultant for Dico, Mills was an employee of Fehr-Graham & Associates and a consultant for Titan Tire Corporation.  *See* Ex. 1151 (Dico Dep.) at 66:14–21.  His duties with respect to the Dico site related solely to the groundwater contamination, and he never had any responsibilities with respect to the buildings on Dico's property.  Trial Tr. at 419:20–421:12, 435:8–436:5.

report.[10]  *See* Ex. 1151 (Dico Dep.) at 179:2–19.

• Titan Tire, acting on behalf of Dico through its President William Campbell ("Campbell"), *see* Trial Tr. at 360:8–13, sold the Dico Buildings to SIM in 2007, *see, e.g.*, *id.* at 377:14–379:12 (explaining that Campbell and Don Brown ("Brown")[11] were acting on behalf of Dico in selling the 12,000-square-foot truck garage because Dico did not have any employees at the time); *see also* Exs. 1026–29.

• Campbell testified that prior to selling the buildings to SIM, he asked Brown to inquire of Mills whether those buildings were subject to any environmental restrictions.  Trial Tr. at 386:8–21.

• Mills testified he assured Brown that he did not know of any environmental restrictions, and also told Brown that he wanted to contact Louis Barrentine ("Barrentine")[12] to see if he was aware of any.  *Id.* at 436:2–5, 436:12–19, 437:16–438:7.  According to Mills's testimony, Barrentine told him that he did not know of "any environmental issues with selling the buildings."[13]  *Id.* at 440:20–25.

• Campbell regularly assigned Titan employees and consultants to complete various environmental work at the Dico site, as instructed by Holley or Morry Taylor, Dico's President.  Ex. 1151 (Dico Dep.) at 37:4–13, 37:25–40:9, 48:20–54:14.  In carrying out his duties, Campbell assigned personnel to assist in completing the annual building inspections for the Dico Buildings and was, thus, familiar with these buildings' environmental history.  *See id.* at 52:11–20.

• Even assuming that Campbell had no prior knowledge of the 1994 PCB removal action inside the Dico Buildings, on September 5, 2007—after SIM had already bought the Dico Buildings but before it had completed their demolition/dismantling—he received an email[14] from Dr. Gazi George ("Dr. George") listing areas of concern that Dico should try to address before the EPA's five-year review inspection of the Dico site scheduled for September 19,

---

[10]    Although Mills testified that he received the 2007 Reuse Planning Report, he claimed that he never read past its cover page because he realized that the report was outside the scope of his assigned duties, i.e., the groundwater contamination.  *See* Trial Tr. at 463:23–464:9.

[11]    Brown was a consultant who Campbell assigned to "handle[] all the special projects, inventory reduction, disposal of assets, dead assets, that type of thing."  Trial Tr. at 388:5–7.

[12]    Barrentine is an environmental consultant for Holley and, "[a]s part of this consulting work, he provided consulting services for Dico."  Ex. 1151 (Dico Dep.) at 74:19–75:2.

[13]    As discussed *infra* n.29, the Court is not persuaded that this inquiry actually took place.

[14]    This email was also sent to Mills.  *See* Ex. 1000.

8

2007.[15]  *See* Ex. 1000.  Among other things, Dr. George explained that, because of "the presence of PCB[s] . . . in some building walls," Dico should be prepared to provide Peterson with the contact information of the purchaser of the buildings but "only if she asks for [this information]."  *Id.* at 42:12–24.

• Even after receiving this email, Campbell did not inform SIM of the presence of PCBs inside the buildings that SIM had purchased from Dico earlier that year.  Trial Tr. at 315:14–316:12, 401:18–403:15.  Nor did he communicate, or direct someone to communicate, the identity of the purchaser of these buildings to the EPA either before, during, or after the EPA's September 19, 2007 Dico site visit.  *Id.* at 76:5–77:12.

• Quintin MacDonald ("MacDonald") is the President of Environmental Management and Engineering, Inc. ("EME") and also an environmental consultant to Holley.  Ex. 1151 (Dico Dep.) at 81:13–18.  Additionally, MacDonald and EME  have been continually providing consulting services to Dico since 2005.[16]  *Id.*; Trial Tr. at 542:5–11.

• On August 7, 2006, Dico and EME had a meeting in Quincy, Illinois.  *See* Exs. 1007–08.  MacDonald attended the meeting on behalf of EME and Holley was present on behalf of Dico.  Trial Tr. at 560:18–20.  Among the topics discussed was the contamination inside the Dico Buildings.  *See* Ex. 1008 at 2.  In fact, the notes from the meeting reflect that EME and Dico discussed that the contaminants are "located in floors, walls and insulation."  *Id.*

• MacDonald also received and read the March 2007 Reuse Planning Report shortly after it was issued.  Trial Tr. at 563:23–564:11.

• MacDonald testified that he understood the Dico Buildings to be contaminated even after the EPA issued the "Notice of Completion" on May 8, 1997.  *Id.* at 555:1–17.

2.  *Injury to the public.*

• PCBs are probable carcinogens, and are listed as hazardous substances at any concentration.

---

[15]  Since June 2000, Dr. George has been retained as an environmental consultant to Holley, and "[a]s part of his consulting work, he provides consulting work for Dico."  Ex. 1151 (Dico Dep.) at 24:19–21; *see also* Ex. 1150 (Dr. George Dep.) at 42:12–24.  From May 2005 to February of 2007, however, he did not perform any consulting work because he was in prison for committing environmental felonies.  Ex. 1150 (Dr. George Dep.) at 45:12–20; Exs. 1129–30. Dr. George's involvement with the Dico site actually dates back to the end of 1992 or the beginning of 1993 when he did consulting work in connection with Titan International's purchase of Dico.  Ex. 1150 (Dr. George Dep.) at 23:12–22.

[16]  The primary focus of this consulting work has been the groundwater contamination at the Dico site.  Trial Tr. at 542:12–14.

9

Ex. 1122 at 2; Trial Tr. at 88:9–14.

- "[A] couple of [SIM's] employees" took insulation for personal use from some of the buildings that Dico sold to SIM in 2007. *Id.* at 314:23–315:7.

- SIM had stored the contaminated steel beams on its property in Ottumwa, Iowa. Access to the property was not restricted by a fence or other means. *Id.* at 88:18–89:3.

- Some PCBs had already migrated into the environment prior to the SIM site removal action. *Id.* at 89:9–16.

- There is a juvenile home approximately 750 feet from the SIM property. *Id.* at 317:11–12.

- There have been trespassers on the SIM property "[m]any times." *Id.* at 332:12–14.

- There has been no evidence of actual harm to people and/or animals as a result of the dismantling/demolition of the Dico Buildings. *Id.* at 170:8–24.

    3.    *Dico's financial abilities.*

- Dico generates no revenue, has only a few assets and liabilities, and "[t]he only real activity that is run through it is relating to the remediation and cleanup of the EPA site here in Des Moines." Trial Tr. at 662:22–663:7.

- On July 17, 2003, Titan International and Dico entered into a contract, whereby Titan International agreed to make "loan advances"[17] to Dico, which "shall not at any time exceed $11,000,000.00." Ex. 1010 at 2 (Recital "B"). As of December 31, 2012, Dico had at least $4,868,000.00 of these loan advances still available. Ex. 2062 (showing an inter-company liability in the amount of $6,132,000.00, which leaves $4,868,000.00 in available funds).

- As collateral for this financing, Dico gave a mortgage and a security interest on its land and all rights related to it, its buildings, and "all other assets" to Titan International. Ex. 1010 at 2–4 (Recital "C").

    4.    *Economic benefit of violating the 1994 Building UAO.*

- In 2007, SIM acquired some of Dico's buildings for a total purchase price of $160,200.00. Dico received $31,320.00 of that amount in cash and $128,880.00 in the form

---

[17]    Pursuant to the terms of this agreement, Titan International agrees to "make . . . [these loan] advances to . . . [Dico] for cleanup, remediation and maintenance of, and providing security for, the . . . [Dico] property and [p]remises and related expenditures." Ex. 1010 at 2 (Recital "B").

of in-kind services.  Trial Tr. at 685:4–7.

• Only $117,000.00 of the total purchase price paid by SIM was directly attributable to buildings regulated by the 1994 Building UAO.  *Id.* at 320:23–25, 505:7–12, Exs. 1026–27.

• Plaintiff's real estate appraisal expert, Patrick Schulte ("Schulte") testified that as a result of SIM's removal of these regulated buildings,[18] Dico's property increased in value by $720,000.00.  *Id.* at 253:14–19.

    5.    *Vindicating EPA's authority.*

• When addressing contaminations at Superfund sites, the EPA follows the so-called polluters pay principle, "which basically means that the person who has liability under CERCLA for that contamination should be responsible for funding the investigation and cleanup."  Trial Tr. at 44:13–19.  Thus, the EPA relies on these responsible parties to conduct the long-term operation and maintenance activities at Superfund sites where some contaminants remain even after the completion of the removal action.  *Id.* at 46:2–23.

• Over the past ten to fifteen years "the [hazardous response] fund has dwindled."  *Id.* at 44:2–10.  Accordingly, the "EPA is more and more reliant on potentially responsible parties" to conduct the investigations and cleanup actions at Superfund sites.  *Id.* at 44:10–12.

• The Dico site remains subject to three separate EPA UAOs.  *Id.* at 47:47:1–22.  All of them contain a long-term operation and maintenance requirement and a notification requirement that are identical to those contained in paragraphs 31 and 59[19] of the 1994 Building UAO.  *Id.*

• The EPA includes such long-term operation and maintenance and notification requirements in all of its UAOs, "where the . . . removal action calls for contaminants to remain on-site."  *Id.* at 47:23–48:4.

---

[18]    The term "regulated buildings," as used throughout this Order, denotes those buildings that were subject to the 1994 Building UAO.

[19]    At summary judgment, the Court concluded as a matter of law that Dico violated these two paragraphs of the 1994 Building UAO.  *See* Order (Clerk's No. 128) at 32–40.

III.  CONCLUSIONS OF LAW[20]

A.  *Civil Penalty*

Plaintiff argues that a civil penalty of at least $2,216,000.00 is appropriate in light of the seriousness of Dico's violations of the 1994 Building UAO.  *See* Pl.'s Post-Trial Br. ("Pl.'s Br.") (Clerk's No. 196) at 44–51.  Dico counters, claiming that such an unprecedented civil penalty is not warranted under the facts of this case and that the Court should impose "no, or minimal, civil penalties."  *See* Def.'s Post-Trial Br. ("Def.'s Br.") (Clerk's No. 197) at 5.

1.    *Duration of Dico's violation.*

The parties have a fundamental disagreement as to the duration of Dico's violations of the 1994 Building UAO.  Plaintiff contends that Dico's violations lasted 162 days[21] while Dico claims that they were a "one-time event for which only one day of per diem civil penalties may be imposed."  *Compare* Pl.'s Br. at 44 *with* Def.'s Br. at 26.  The premise of Dico's claim is that it violated the 1994 Building UAO not by having some of the regulated buildings removed, but by failing to give the EPA notice of the removal.[22]  *See* Def.'s Br. at 26.  This claim, however,

---

[20]    The Court is aware that some of the evidence adduced at trial, although relevant to the issues of civil penalties and punitive damages, is also probative of Dico's liability.  To the extent that the Court considers such evidence in its analysis, it does so only as that evidence relates to the issues reserved for trial and has no intention to revisit its prior rulings in this case.

[21]    Plaintiff arrives at this duration by calculating the length of SIM's demolition activities at the Dico site.  *See* Pl.'s Br. at 44 (stating that Jim Hughes, the President of SIM, testified that the demolition work began on June 19, 2007 and ended on November 27, 2007).

[22]    Importantly, Plaintiff has never claimed that Dico's violations amount only to a failure to give notice, nor has the Court ever reached such a conclusion.  *See* Order (Clerk's No. 128) at 32–40.  This apparent disparity between the Court's prior rulings and Dico's interpretation of the nature of its 1994 Building UAO violations is likely motivated by Dico's desire to limit the duration of its violations.  Indeed, immediately after claiming that "[a]t most, Dico's violation was its failure to give notice to [the] EPA," Dico proceeds to discuss case law supporting its

misinterprets prior rulings of this Court.

On March 6, 2013, the Court concluded as a matter of law that Dico violated paragraphs 31 and 59 of the 1994 Building UAO.  *See* Clerk's No. 128 at 33–40.  Paragraph 31[23] requires Dico to submit to the EPA for approval an O&M Plan "present[ing] the actions necessary to ensure the protectiveness and integrity of the removal action, including long[-]term maintenance

---

position that failing to give notice is a "one-time, one-day" violation, rather than a continuous and ongoing violation of the 1994 Building UAO.  *See* Def.'s Br. at 26–29.

Even assuming, however, that Dico's only violation of the 1994 Building UAO was its failure to give notice to the EPA prior to building demolition, the Court does not agree that the cases cited by Dico support its position that the failure to give such notice was a one-day violation.  For instance, the main case that Dico relies on, *United States v. Trident Seafood Corp.*, 60 F.3d 556 (9th Cir. 1995), involves a specific regulation enacted pursuant to the Clean Air Act ("CAA")—40 C.F.R. § 61.146 (1990).  *See Trident Seafood*, 60 F.3d at 558.  Although the Ninth Circuit held that Trident Seafood's failure to give notice to the EPA prior to removing asbestos from its fish cannery was a one-time violation of § 61.146, meriting only one day of per diem penalties, its holding does not compel the same conclusion in this case because § 61.146's language is different from the language of the 1994 Building UAO's paragraph 59 which, unlike paragraph 31, contains a notice requirement.  *Compare Trident Seafood*, 60 F.3d at 558 (noting that "Trident's only obligation under the clear language of the regulation . . . was to notify [the] EPA *before* renovation began") *with* paragraph 59 of the 1994 Building UAO (requiring that Dico "immediately" notify the EPA of the change in site condition).

Similarly unavailing is *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008 (8th Cir. 2010).  At issue in *Sierra Club* was a different regulation enacted pursuant to the CAA—40 C.F.R. § 52.21(r)(1).  *See* 615 F.3d at 1016.  Relying on the specific language of this provision, the Eighth Circuit rejected the plaintiff's argument that a polluting facility had an ongoing duty to obtain a PSD (Prevention of Significant Deterioration) permit.  *Id.* at 1015–16.  The court concluded that because § 52.21(r)(1) "obliges a facility to obtain a permit *before* commencing construction," the failure to timely obtain such permit was not an ongoing, but rather a one-time, violation.  *Id.* at 1016 (emphasis added).

Although the Court will not specifically discuss the remaining cases relied on by Dico, *see* Def.'s Br. at 28 (citing cases from the Third, Seventh, and Eleventh Circuits), it has carefully reviewed them and finds them inapposite.

[23]      Notably, paragraph 31 does not contain any notice requirement.  *See* Ex. 7 ¶ 31.

of all interior surface sealing, encapsulation of all building insulation and appropriate reporting, including, at a minimum, submittal of a written report on an annual basis." Ex. 7 ¶ 31.  Once the EPA approves the O&M Plan, Dico must implement the measures necessary to "ensure the protectiveness and integrity of the removal action."  *Id.*  It is axiomatic that the demolition or the dismantling of some of the regulated buildings in 2007 necessarily breached "all interior surface sealing [and] encapsulation of all building insulation" containing PCBs.  Therefore, Dico was in violation of paragraph 31 of the 1994 Building UAO for a period of at least 162 days because it failed "to ensure the protectiveness and integrity of the removal action" during the time when SIM was demolishing the buildings in question.

Paragraph 59[24] imposes a duty on Dico "to prevent, abate or minimize" any additional release of PCBs on its property and the resulting dangers of such release caused by a "change in site conditions."  Ex. 7 ¶ 59.  Since the Court has already concluded as a matter of law that the Dico Buildings contained PCBs even after the completion of the removal action pursuant to the 1994 Building UAO, SIM's demolition activities necessarily breached the encapsulation, thus causing an additional release of PCBs at the Dico site.  *See* Order (Clerk's No. 128) at 38–39. Not only did Dico not prevent such additional release, it also did nothing to minimize it or its associated dangers.  Because this additional release of PCBs and its associated dangers lasted for the entire duration of the building demolition, Dico was in violation of paragraph 59 for 162 days.

---

[24]    Unlike paragraph 31, paragraph 59 contains a notice requirement, but also imposes obligations on Dico going well beyond its duty to notify the EPA of any PCB releases.  *See* Ex. 7 ¶ 59.

14

2.      *Legal standard.*[25]

CERCLA authorizes civil penalties for "[a]ny person who, without sufficient cause, . . .

fails . . . to comply with any [EPA order] . . . [up to] $25,000[26] for each day in which such

violation occurs or such failure to comply continues."  *See* 42 U.S.C. § 9606(b)(1).  "Trial courts

have considerable discretion in fashioning appropriate civil penalties."  *United States v. Gurley*,

235 F. Supp. 2d 797, 805 (W.D. Tenn. 2002) (citing *United States v. ITT Cont'l Baking Co.*, 420

U.S. 223, 230 n. 6 (1975)); *accord United States v. Barkman*, No. 96-6395, 1998 U.S. Dist.

LEXIS 20248, at *52–53 (E.D. Pa. Dec. 17, 1998) (noting that trial courts have "discretion

whether to [even] impose a fine under the permissive language of § [96]06(b)").  "[Discretion,

however, must] take[] account of the law and the particular circumstances of the case and . . .

[must be] directed by the reason and conscience of the judge to a just result."  *Burns v. United

States*, 287 U.S. 216, 223 (1932) (internal citation and quotation marks omitted).  Thus, when

assessing CERCLA civil penalties, district courts "should give effect to the major purpose of a

civil penalty:  deterrence."  *United States v. M. Genzale Plating, Inc.*, 807 F. Supp. 937, 938

---

[25]      The parties disagree as to the approach the Court should take in arriving at the appropriate amount of civil penalties.  Plaintiff insists that "[a] top-down approach is the best method for calculating civil penalty, starting at the maximum penalty and discounting based on the factors that the Court identified in its March 6, 2013 Order."  Pl.'s Am. Trial Br. (Clerk's No. 185) at 7.  Dico resists this contention, claiming that "a 'bottom up' approach is much more practical."  Def.'s Br. at 29 (internal citation omitted).  Although employing either one of these two methods could be helpful in arriving at the total penalty amount to be assessed against Dico, the Court is aware of no legal authority requiring that either method be chosen.  Indeed, § 9606(b)(1), which authorizes the imposition of civil penalties, contains only one limitation on the Court's discretion, i.e., that the daily penalty amount does not exceed $25,000, as adjusted for inflation (*see infra* n.26).

[26]      This amount is indexed for inflation and, at all times material to this case, was $32,500. 40 C.F.R. § 19.4 (setting $32,500 per day as the maximum amount of civil penalties for the period of March 15, 2004 through January 12, 2009).

(quoting *United States v. Grown Roll Leaf, Inc.*, 29 E.R.C. 2025, 2031 (D.N.J. 1989)).  The

imposition of civil penalties in this case will "serve both a specific and [a] general deterrent

purpose, deterring future violations by . . . [Dico] and similar violations by others."  *See United*

*States v. Lecarreaux*, No. 90-1672, 1992 U.S. Dist. LEXIS 9365, at \*41 (D.N.J. Feb. 18, 1992)

(internal citations and quotation marks omitted).  To accomplish this dual deterrence purpose,

the penalty amount "should be large enough to hurt, and to deter anyone in the future from

showing as little concern as . . . [Dico] did for the need to [comply with the 1994 Building

UAO]."  *See id.* at \*42 (internal citations and quotation marks omitted).

3.      *The five-factor test.*

In arriving at the appropriate penalty amount in this case, the Court looks to the following

five factors for guidance: "'(1) the good or bad faith of [Dico], (2) the injury to the public, (3)

[Dico's] ability to pay, (4) the desire to eliminate the benefits derived by [the] violation, and (5)

the necessity of vindicating the authority of the enforcing party.'"  Order (Clerk's No. 128) at 40

(quoting *M. Genzale Plating, Inc.*, 807 F. Supp. at 939).

a.      *Bad faith.*

Dico contends that the evidence at trial "clearly established" that the people acting on

behalf of Dico in selling the buildings to SIM acted in good faith and without actual knowledge

of the residual PCB contamination inside the Dico Buildings.[27]  Def.'s Br. at 33.  Even assuming

---

[27]     Using the willful blindness doctrine, the Court can conclude that at least Mills knew of
this residual contamination.  This doctrine has "two basic requirements: (1) the defendant must
subjectively believe that there is a high probability that a fact exists and (2) the defendant must
take deliberate actions to avoid learning of that fact."  *Global-Tech Appliances, Inc. v. SEB S.A.*,
131 S. Ct. 2060, 2070 (2011).  Dico claims that prior to selling the buildings to SIM, Campbell,
through Brown, inquired of Mills whether those buildings were subject to any environmental
restrictions.  Trial Tr. at 386:13–387:15.  Mills told Brown that he was not aware of any

16

that this contention were true,[28] whether the individuals acting on behalf of Dico had personal

knowledge of the PCBs is largely irrelevant because it is Dico—not its agents in their individual

capacities—that is liable for civil penalties.[29]   Therefore, all that matters is that the evidence

---

environmental restrictions, and also contacted Barrentine, who was also a consultant for Dico, to
see if he was aware of any such restrictions. *Id.* at 436:6–19.  Prior to Campbell's inquiry, Mills
had received a copy of the 2007 Reuse Planning Report for the Dico site, but after reading only
Peterson's cover letter, he concluded that the entire report was beyond the scope of his duties,
i.e., his duties pertaining to the groundwater contamination at the Dico site, and did not read it.
*Id.* at 463:23–464:9.  As stated in Peterson's cover letter, however, this report addressed the Dico
site's environmental issues in general, including the groundwater contamination, which was
admittedly within Mills's scope of duties.  *See* Ex. 199 at 1 (noting that "significant
environmental issues remain at the [Dico] site").  The general tone of this cover letter combined
with Campbell's inquiry as to potential environmental restrictions on the sale of the buildings are
sufficient for the Court to find that Mills subjectively believed there was a high probability that
the regulated buildings sold to SIM in 2007 contained some hazardous substance and were,
therefore, subject to ongoing environmental compliance obligations.  *See Global-Tech
Appliances, Inc.*, 131 S. Ct. at 2070.  Despite such clues, however, Mills did not read the report
or any of the other documents in his possession which detailed the environmental history of the
buildings at issue prior to their sale to SIM.  Trial Tr. at 448:20–452:6.  Indeed, he took
"deliberate actions to avoid confirming [this] high probability of . . . [a hazardous substance
contamination inside the regulated buildings] and . . . can almost be said to have actually known
[about such contamination]."  *See Global-Tech Appliances, Inc.*, 131 S. Ct.  at 2070–71 (internal
citation omitted).  Therefore, at least Mills, who knew that Dico intended to sell the buildings at
issue to SIM in 2007, must be credited with knowledge of the residual PCB contamination
inside.

[28]      The evidence at trial leaves little, if any, room for such an assumption.  For instance,
even were the Court to credit Campbell's and Mills's testimony that they had no knowledge of
the remaining PCBs inside the buildings, both of them received Dr. George's September 5, 2007
email advising them of "the presence of PCB[s] . . . in some building walls."  *See* Ex. 1000.
Neither Campbell nor Mills, however, communicated this information to SIM or to the EPA
even though Peterson conducted a site visit at the Dico site on September 19, 2007, a mere two
weeks after the email.

[29]      For this reason, Dico's argument that it acted in good faith in selling the buildings to SIM
because all the people involved in those transactions on Dico's behalf "made reasonable and
logical inquiries into the possible existence of environmental restrictions on the sale or removal
of buildings," *see* Def.'s Br. at 33, is misplaced and unavailing.  Therefore, the Court need not
decide whether Campbell, through Brown, inquired of Mills, who in turn inquired of Barrentine,
as to any environmental restrictions applicable to these buildings.  *See id.* at 16–17; *see also* Pl.'s

presented at trial conclusively established that Dico had knowledge of the residual PCB

contamination.[30] *See supra* pp. 6–9 (recounting testimony of Fechter, Campbell, Dico, and

MacDonald, as well as other evidence,[31] proving that, at the time it sold the regulated buildings

---

Br. at 39–44.  Even assuming, however, that such an inquiry were important in establishing that Dico acted in good faith in selling the buildings, the Court is not persuaded that such inquiry actually occurred for the following three reasons.  First, Barrentine's testimony regarding the inquiry from Mills is less than conclusive.  Indeed, he testified initially that the inquiry took place, then he retracted that testimony, and towards the end of his deposition, he stated that Mills may have called him but that he did not recall what they talked about.  Ex. 1148 (Barrentine Dep.) at 82:17–83:14, 83:16–84:12, 227:19–228:19, 243:4–244:6.  Second, Barrentine's logbook does not establish that he and Mills ever discussed environmental issues affecting the regulated buildings.  Concededly, the logbook contains an entry documenting a phone call from Mills on May 2, 2007, but this entry only states that Dico was looking to sell the maintenance building and there is no mention of environmental issues.  *See* Ex. 200 at 1.  Third, when asked about his knowledge regarding this alleged inquiry, Dr. George testified that "[a]ll . . . Campbell told . . . [him] was *to try and say* that . . . [Campbell] had conferred with . . . [Mills], through . . . Brown, [and] that . . . [Campbell] asked for the environmental clearance  to see if there were any issues with the . . . buildings."  Ex. 1150 (Dr. George Dep.) at 254:2–6 (emphasis added).

[30]    Throughout this litigation, Plaintiff has consistently maintained that as a corporation, Dico "never forgets what it learned at one time."  *See* Trial Tr. at 488:6–9; *see also* Hr'g Tr. (Clerk's No. 86) at 72:16–17.  Therefore, as far back as 1997, Dico knew that residual PCBs remained inside the regulated buildings even after the completion of the PCB removal action undertaken pursuant to the 1994 Building UAO.  Ex. 1149 (Fechter Dep.) at 86:17–87:2, 87:18–88:11, 97:12–98:12.  Even assuming, however, that Dico "forg[o]t[] what it learned" in 1997, it was reminded in March 2007 (less than three months prior to the 2007 transactions with SIM) when Mills and Holley received copies of the 2007 Reuse Planning Report for the Dico property that the regulated buildings still contained PCBs.  Ex. 199 at 4.  Therefore, based on this and other evidence introduced at trial, the Court has determined that at the time of selling the buildings to SIM in 2007, Dico knew that they still contained PCBs.

[31]    For instance, Holley, Dico's general counsel and officer in charge of managing all environmental matters related to Dico, knew that the buildings sold to SIM were contaminated with PCBs.  *See* Ex. 1151 (Dico Dep.) at 179:2–180:6, 180:25–181:6 (Gary Schuster testifying on behalf of Dico that Holley received a copy of the March 2007 Reuse Planning Report, which clearly stated that the buildings in question still contained PCBs); Trial Tr. at 560:18–20 (MacDonald testifying that Holley attended a meeting between Dico and EME on Dico's behalf, where the attendees discussed that contaminants are "located in floors, walls and insulation" (*see* Ex. 1008 at 2)).  Dico maintains that "Holley's knowledge about environmental restrictions affecting the buildings . . . is . . . irrelevant and should not be considered by the Court" because

to SIM, Dico knew that they contained PCBs and were, thus, subject to ongoing testing and

maintenance to ensure the protectiveness of the PCB encapsulation inside).[32]   Yet, Dico sold

---

the evidence at trial established that she had not been consulted prior to selling the regulated buildings to SIM.  Def.'s Br. at 13 n.4.  The Court disagrees.  As Dico's general counsel and officer in charge of managing all environmental matters related to Dico, her knowledge about the environmental restrictions affecting the buildings is imputed to Dico, and is, therefore, relevant.  *See infra* n.32.  The fact that Holley may not have been contacted prior to selling the regulated buildings to SIM does not change the Court's conclusion that Dico knew of the residual PCBs inside those buildings prior to selling them to SIM.

[32]     It is a fundamental principle of agency law that the knowledge of an agent is imputed to his/her principal, so long as that knowledge is related to the subject matter of the agent's authority.  *See Am. Sur. Co. v. Pauly*, 170 U.S. 133, 153 (1898) ("It is the rule that the knowledge of the agent is the knowledge of his principal, and notice to the agent of the existence of material facts is notice thereof to the principal, who is taken to know everything about a transaction which his agent in it knows.  This rule is sometimes stated so as to limit it to notice arising from, or at the time connected with, the subject-matter of his agency."); *Tonelli v. United States*, 60 F.3d 492, 492 (8th Cir. 1995) ("As a general rule, notice to an agent is effective if the agent has a duty to receive that knowledge and report it to the principal."); *Martin Marrietta Corp. v. Gould, Inc.*, 70 F.3d 768, 773 (4th Cir. 1995) ("The general rule of imputation of knowledge from agent to principal rests upon a legal fiction and a presumption.  The fiction is that when the agent acts within the scope of the agency relationship, there is an identity of interest between principal and agent. . . .  The presumption is that the agent will perform his duty and communicate to his principal the facts that the agent acquires while acting in the scope of the agency relationship.  Thus, under the rule of imputation the principal is chargeable with the knowledge the agent has acquired, whether the agent communicates it or not." (internal citation omitted)); *Anderson v. Gen. Am. Life Ins. Co.*, 141 F.2d 898, 908 (6th Cir. 1944) ("As a general rule, the principal is held to know all that his agent knows in any transaction in which the agent acts for him." (internal citation and quotation marks omitted)); Restatement (Second) of Agency § 272 ("[T]he liability of a principal is affected by the knowledge of an agent concerning a matter as to which he acts within his power to bind the principal or upon which it is his duty to give the principal information.").  Therefore, for instance, under this principle, Fechter's or Holley's knowledge of the presence of PCBs inside the regulated buildings even after the completion of the removal action is imputed to their principal, Dico.  *See* Ex. 1149 (Fechter Dep.) at 11:12–23, 86:17–87:2, 123:23–125:10 (establishing that Fechter's knowledge regarding the existence of PCBs was within the subject matter of his agency); Ex. 1151 (Dico Dep.) at 61:17–62:3, 71:13–21, 74:1–10, 79:12–80:4, 179:2–180:6, 180:25–181:6, Trial Tr. 560:18–20, Ex. 1008 at 2 (establishing the same as to Holley).  Thus, when Dico sold some of the regulated buildings to SIM in 2007, it did so knowing that they still contained PCBs.  Accordingly, Dico acted in bad faith because it knew that SIM intended to demolish these buildings, *see* Exs. 1026–28, which was certain to bring about Dico's violations of paragraphs 31 and 59 of the 1994

some of the very buildings still contaminated with PCBs to SIM fully understanding that SIM

intended to demolish them, *see, e.g.*, Exs. 1026–27 (representing SIM's intentions to "demo[lish]

and remove" the buildings at issue), thus breaching the PCB encapsulation and causing a release

or a threat of release of PCBs into the environment and, of course, violating paragraphs 31 and

59 of the 1994 Building UAO in the process.[33]  Motivated by a desire for a financial gain,[34] Dico

did not even make an effort to determine whether any state or federal environmental

requirements applied to the disposal of the building debris resulting from this demolition.  Ex.

1151 (Dico Dep.) at 176:15–177:9.  Dico's conduct with regard to the underlying events in this

litigation[35] is reprehensible and warrants a substantial penalty.

---

Building UAO.

[33]     The evidence at trial does not support Dico's claim that it acted in good faith because it would not have otherwise sold the buildings to SIM "the very summer it knew an EPA official . . . would be present to witness the allegedly improper activity."  *See* Def.'s Br. at 18.  Peterson testified that it was not until July of 2007 that she began discussions with Dico regarding scheduling her site visit, at which point SIM had already purchased the buildings and started the demolition.  Trial Tr. at 71:2–13, 306:11–16.  Therefore, the Court is not persuaded that Dico knew of the upcoming EPA site visit.

[34]     Dico knew that removing the regulated buildings would make its property more appealing to potential purchasers.  *See* Trial Tr. at 406:22–409:16 (Campbell testifying that he constantly received inquiries about the Dico property by potential purchasers).  Indeed, Dico tried to convince Polk County Assessor's Office that due to the PCB contamination inside the regulated buildings, the property's assessed value was overstated.  *See id.* at 695:1–11.  Additionally, Dico was aware that decontaminating the buildings would be very costly.  *See* Ex. 1118 at 24 (estimating the present value of such expenses as of December 17, 1996 to be $2,876,000.00).  Taken together, this evidence establishes that Dico's motivation in selling the regulated buildings to SIM was to make its property more valuable to potential purchasers without incurring the substantial expenses associated with proper decontamination of the buildings.  Such motivation also explains why Dico did not tell SIM that the buildings at issue contained PCBs.

[35]     To the extent Dico argues that its prior history of compliance with EPA orders should be a mitigating factor that the Court should consider in assessing civil penalties and punitive

b. *Injury to the public.*

Dico claims that this factor weighs in favor of assessing no, or minimal, penalty because Plaintiff adduced no evidence at trial of any actual physical harm to people, animals, or the environment.[36]  Def.'s Br. at 34–37.  The mere absence of actual harm does not mean, however, that Dico's violations of the 1994 Building UAO are not serious.[37]  Indeed, in the CERCLA context, at least two courts have found an injury to the public based on the mere potential for such an injury.[38]  *See United States v. Crown Roll Leaf, Inc.*, No. 88-831, 1989 U.S. Dist. LEXIS

---

damages for Dico's violations of the 1994 Building UAO, *see* Def.'s Br. at 9–10, 48, such argument is rejected.  Even assuming that Dico's compliance history was impeccable, obeying the law (EPA orders) is what was expected of Dico.  Indeed, complying with the various EPA orders applicable to its property was by no means elective.  To the contrary, failing to comply with these orders' provisions would have certainly exposed Dico to potential liability for response costs, civil penalties, and punitive damages.

[36]    In support of its claim that the violations of the 1994 Building UAO did not result in an injury to the public, Dico also points out that there is no evidence of any PCB releases on its property during SIM's demolition work.  *See* Def.'s Br. at 20.  Although true, this assertion ignores the fact that no one actually tested for any PCBs during the building demolition.  Since the buildings contained residual PCBs encapsulated by the epoxy paint inside, breaching that encapsulation during the demolition activities necessarily resulted in a release of PCBs.  *See* Order (Clerk's No. 128) at 38–39.  Indeed, the EPA's fourth five-year review report prepared following Peterson's September 19, 2007 Dico site visit confirms the Court's conclusion.  *See* Ex. 30 at 7 (stating that "[t]he demolition activities may have resulted in unacceptable short-term risks to construction workers" because of their exposure to the PCBs).

[37]    Nor could such a conclusion follow from the EPA's failure to halt the demolition of the buildings on or after Peterson's September 19, 2007 Dico site visit.  *See* Def.'s Br. at 18–20.  Contrary to Dico's assertion, the EPA's reaction to the building demolition was anything but "tepid."  *See id.* at 18.  Although the Agency did not order Dico to stop the demolition, Peterson promptly inquired who had purchased the buildings (information that Dico did not disclose until January 22, 2008), consulted with her supervisor and a staff attorney, prepared a site inspection report, and ultimately sent a letter to Dico requesting information regarding the identity of the purchaser and the location of the building materials.  Trial Tr. at 73:24–77:12.

[38]    Additionally, in the context of assessing civil penalties under the Clean Air Act ("CAA") and the Clean Water Act ("CWA"), several courts have concluded that statutory violations that

19193, at *28–29 (D.N.J. Apr. 28, 1989) ("In assessing a civil penalty, a court need not find that

an actual injury to the public has occurred; rather, the court need only assess the potential injury

to the public." (internal citation omitted)); *United States v. Martin*, No. 99 C 1130, 2000 U.S.

Dist. LEXIS 11564, at *27 (N.D. Ill. July 26, 2000) (concluding that the defendant's delay in

responding to the EPA's request for information "injured or had the potential to injure the

public"). Additionally, some courts have found an injury to the public even where the

defendants' actions did not even cause a release or a threat of release of hazardous substances.

*See Gurley*, 235 F. Supp. 2d at 807 (finding injury to the public, where the defendant failed to

comply with the EPA's CERCLA information request because such non-compliance caused the

EPA to expend Superfund money, thus precluding the Agency from allocating those funds to

other Superfund sites); *United States v. Taylor*, No. 90-cv-851, 1994 U.S. Dist. LEXIS 10954, at

*10–11 (W.D. Mich. May 18, 1994)[39] ("The delay itself does not appear to have caused injury to

the public, and it is unlikely that Michigan thought that a delay would be harmful to the public.

---

could potentially result in environmental harm were serious even absent proof of such harm.
*See, e.g.*, *United States v. Smithfield Foods*, 972 F. Supp. 338, 344 (E.D. Va. 1997) ("The court
may justifiably impose a significant penalty [under the CWA] if it finds there is a risk or
potential risk of environmental harm, even absent proof of actual deleterious effect."); *Pound v.
Airosol Co.*, 498 F.3d 1089, 1099 (10th Cir. 2007) (finding that "a lack of evidence on the record
linking . . . [the defendant's] CAA violations to discrete damage to either the environment or the
public [does not] *necessarily* justif[y] the conclusion that . . . [the defendant's] violations were
not 'serious'"); *United States v. Mac's Muffler Shop, Inc.*, No. 85-138R, 1986 U.S. Dist. LEXIS
18108, at * 24 (N.D. Ga. Nov. 4, 1986) ("[The] injury[-]to[-]the[-]public [factor] does not
require proof of actual injury to identifiable individuals, for civil penalties [under the CAA] are
not 'tied to damages actually suffered.'" (internal citation omitted)).

[39]     Although the statute at issue in *Taylor* is the Michigan Environmental Response Act
("MERA"), the district court applied the same five-factor test to determine the appropriate civil
fine amount under MERA as this Court does in this case under CERCLA. *See* 1994 U.S. Dist.
LEXIS 10954, at *5–6.

However, there is a more general injury to the public caused by private landowners who deny access or delay access to contaminated sites, such that the agency's ability to remedy problem sites is impeded.  To allow an unreasonable denial to go unpunished entirely would encourage others to deny lawful access.").

It is true that unlike the defendants in *Gurley* and *Taylor*, Dico did not fail to respond to an EPA information request or to allow the EPA access to its site.  By selling the buildings to SIM without disclosing the fact that they still contained PCBs, however, Dico created another Superfund site (the SIM site in Ottumwa, Iowa), thus causing the EPA to spend Superfund money in investigating the PCB release at the SIM site and overseeing the PCB removal action and, at the same time, preventing the Agency from allocating that money to other Superfund sites.  Furthermore, Dico's delay in disclosing to the EPA the identity of the purchaser of the regulated buildings led to expending additional Superfund dollars, *see* Trial Tr. at 76:18–77:12 (detailing the actions that the EPA undertook in an effort to identify the purchaser of the buildings and the location of the building debris), and impeded the Agency's ability to institute a timely clean-up of the SIM site.  For these reasons, the Court concludes that Dico's violations of the 1994 Building UAO injured the public[40] despite the lack of evidence of actual harm.[41]

---

[40]     This conclusion disposes of the need to discuss the issue of the actual concentration of the PCBs released at the SIM site.  Since actual, identifiable harm is not a prerequisite for concluding that Dico's conduct injured the public, discussing the evidence concerning PCB concentration is unnecessary in this case.  Although evidence related to PCB concentrations is generally relevant with respect to the injury-to-the-public factor, the Court has already determined that Dico injured the public in ways that have nothing to do with the actual PCB concentration:  (1) by causing the EPA to expend Superfund money in connection with the SIM site removal action, thus preventing it from allocating such funds to other Superfund sites; and (2) by impeding the Agency's ability to timely institute the SIM site removal action.

Moreover, even were the Court to credit the testimony of Dico's expert witness, Dr.

c. *Dico's ability to pay.*

It is undisputed that Dico is not currently generating any revenues from operations and has no assets that it can liquidate to pay a civil penalty.  Trial Tr. at 662:22–663:11.  Plaintiff argues that this inability to satisfy any adverse judgment "should not be a mitigating factor in the penalty analysis."  Pl.'s Br. at 34.  Dico disagrees, urging the contrary position.  *See* Def.'s Br. at 40–47.  Specifically, Dico claims that the evidence in this case clearly shows that "Dico has no ability to pay civil penalties," and that, therefore, any penalties imposed should be commensurate with its financial condition.  *See id.* at 40.  The Court agrees that Dico's ability to pay is something of a mitigating factor.  Indeed, in light of all the evidence presented at trial, the Court is doubtful that Dico would be able to satisfy any adverse judgment even if it sold its real property and all other assets because virtually all of Dico's assets have already been encumbered by the mortgage and the security interest in favor of Titan International.  *See* Ex. 1010 at 2–4.

---

Remy Hennet ("Dr. Hennet"), it would still conclude that Dico's conduct injured the public by creating a risk of harm.  Dr. Hennet testified that the total quantity of PCBs present on the steel beams and in the insulation was approximately 0.041 pounds.  Trial Tr. at 634:16–635:10, 635:24–637:12.  Relying on Dr. Hennet's opinion, Dico argues that the PCB release at the SIM site did not create "[a] meaningful risk of harm to the public."  *See* Def.'s Br. at 35–37.  The fact remains, however, that the evidence presented at trial, including Dr. Hennet's testimony, does not support a finding that the PCBs released at the SIM site did not create a risk of harm.  Although the parties disagree as to this risk of harm's likelihood to produce actual injuries, even Dico tacitly admits that the release resulted in *some* risk of harm.  *See* Def.'s Br. at 35, 36 (arguing that the release did not create any "*meaningful* risk of harm to the public" (emphasis added)).  Furthermore, the Court finds that Dr. Hennet's reliance on the reportable quantity of PCBs, rather than their concentrations, is misguided.  When evaluating the risk of harm to the public resulting from a PCB release, the focus is properly on the PCB concentration, not its reportable quantity.  *See* Pl.'s Br. at 29–30.

[41]    To be clear, the absence of evidence of actual harm inures to the benefit of Dico.  Although the Court has concluded that Dico's conduct in this case injured the public, the daily penalty amount set by the Court contains a discount to account for this lack of evidence of actual harm.

24

Considering that Dico's inter-company liability to Titan International as of December 31, 2012

was greater than the appraisal value of Dico's real property,[42] all the proceeds of a potential sale

of the Dico site and its assets will likely be exhausted by this inter-company obligation, and no

money will be left to satisfy any adverse judgments.  Additionally, the Court is doubtful that

Dico could use the approximately $4,868,000.00, *see supra* p. 10,  in available loan advances

that Titan International has agreed to make pursuant to the July 17, 2003 agreement between the

two companies because paying civil penalties does not appear to be one of the purposes for

which the loan advances could be used.  *See* Ex. 1010 at 2 (Recital "B").  Accordingly, this

factor weighs in favor of imposing a lesser civil penalty.[43]

---

[42]     Dico's inter-company liability to Titan International as of December 31, 2012 amounted
to $6,132,000.00.  *See* Ex. 2062.  Schulte, estimated the value of the Dico property, which is its
biggest asset, after the buildings at issue had been removed and accounting for the existing
groundwater contamination to be $3,070,000.00 as of  November 1, 2007.  *See* Trial Tr. at
199:7–10, 203:2–8.  The Court recognizes that Dico's property may have appreciated in value
between November 1, 2007 and December 31, 2012, but finds it exceedingly unlikely that this
potential appreciation could be so substantial as to alter the Court's conclusion.  Indeed, the
Court's conclusion would remain the same even if it were to consider the value of Dico's other
assets.  *See* Ex. 2062 (reporting non-current assets in the amount of $541,000.00 and buildings
and improvements in the amount of $2,402,000.00, less depreciation of $1,898,000.00, for total
assets (excluding land) of $1,045,000.00).  Thus, even assuming that Dico liquidates all of its
assets, the proceeds would likely fall short of repaying its inter-company obligation to Titan
International.

[43]     The Court declines to consider the assets of Titan International when evaluating Dico's
ability to pay for the following two reasons.  First, this issue is far from settled, and those courts
that have dealt with it have taken diametrically opposite positions.  *Compare* Pl.'s Am. Trial Br.
(Clerk's No. 185) at 36 (citing cases outside the CERCLA context where the district courts
considered the assets of the defendant's parent company in setting the penalty amount without
imposing the penalty on the parent company) *and* Pl.'s Br. at 36 (same) *with* Def.'s Br. at 41–44
(citing cases supporting the contrary position).  Second, the proposition of considering the assets
of the parent company, which is not a party to the lawsuit, when assessing civil penalties against
a subsidiary is somewhat at odds with the basic principle of corporate law that each incorporated
business entity enjoys a separate legal existence.  *See Gadsden v. Home Pres. Co.*, No. 18888,
2004 Del. Ch. LEXIS 14, at *12 (Del. Ch. Feb. 20, 2004) (holding that, under the laws of

       d. *Dico's economic benefit.*

By selling the regulated buildings to SIM, Dico realized an economic benefit at least

equal to $837,000.00 ($720,000.00 in the form of property value appreciation[44] and

$117,000.00 in the form of the purchase price that SIM paid for the buildings at issue).  Trial Tr.

at 253:14–19, 320:23–25, 505:7–12, 507:20–508:7, Exs. 1026–28.  Accordingly, to accomplish

the CERCLA civil penalty's general and specific deterrent purposes, the penalty amount

imposed in this case must be sufficient to eliminate this economic benefit resulting from Dico's

violations of the 1994 Building UAO.[45]  *See Mac's Muffler Shop, Inc.*, 1986 U.S. Dist. LEXIS

---

Delaware (Dico's state of incorporation), "[a]bsent sufficient cause, the separate legal existence of a corporation will not be disturbed" (internal citation omitted)); *see also United States v. Bestfoods et al.*, 524 U.S. 51, 61–62 (1998) ("[I]t is hornbook law that the exercise of the control which stock ownership give to the stockholders . . . will not create liability beyond the assets of the subsidiary . . . , [and] nothing in CERCLA purports to reject this bedrock principle . . . ." (internal citations and quotation marks omitted)).

[44]     After evaluating all the relevant evidence presented at trial, the Court has determined that the value of Dico's property as reported by the Polk County Assessor is not representative of the property's market value.  Therefore, the Court credits Schulte's opinion of the Dico property's value following SIM's removal of the regulated buildings over the Assessor's valuation because Schulte's qualifications and the scope of his engagement were better suited to estimating the Dico property's market value.  *See* Trial Tr. at 187:25–195:6 (Schulte testifying regarding the scope of his engagement and his educational background and extensive professional experience as a real estate appraiser), 197:8–198:8 (Schulte testifying that he has appraised many properties with known contamination, one of which was located in the vicinity of the Dico site); *cf. id.* at 691:12–693:12 (Gary Schuster testifying that Dico offered to sell its property to the City of Des Moines in exchange for a six-million-dollar charitable contribution and a ten-year property tax abatement).

[45]     To the extent Dico argues that the Court should offset the economic benefit Dico derived from its violations of the 1994 Building UAO with the expenses Dico incurred in cleaning up the SIM site (approximately $537,000.00), *see* Def.'s Br. at 37, such argument is rejected.  Dico cites no legal authority—nor has the Court found any—permitting such an offset.  Indeed, as Plaintiff points out, subtracting Dico's clean-up costs from the economic benefit derived from its violations runs contrary to the purpose of CERCLA's civil penalty provision because it "would [in effect] reward Dico for . . . its noncompliance with the 1994 [Building UAO]."  *See* Pl.'s Am.

18108, at * 27 (holding, in the context of civil penalties under the CAA, that "[e]limination of the benefits of noncompliance is an essential element of the penalty" and that these benefits are "not necessarily limited to [the] defendant['s] monetary profit from the violation, but must encompass every benefit that defendant[] received from violation of the law"). Therefore, this factor suggests that a penalty of at least $837,000.00 is appropriate.

e. *Necessity of vindicating the EPA's authority.*

Having assessed the evidence presented at trial, the Court finds that there is a need to vindicate the EPA's authority in this case. Dico was unquestionably aware that some of the buildings it sold to SIM in 2007 were still contaminated with PCBs and, thus, remained subject to the ongoing maintenance and testing obligations of the 1994 Building UAO. *See supra* pp. 6–9. Despite such knowledge, however, Dico proceeded to sell those buildings, understanding that SIM intended to tear them down and that such demolition activities would violate the 1994 Building UAO. *See* Exs. 1026–28. The EPA relies almost exclusively on potentially responsible parties ("PRPs"), such as Dico, to conduct the long-term operation and maintenance activities at various Superfund sites and to report and immediately address any releases or threats of release of hazardous substances. *See* Trial Tr. at 46:2–23, 47:23–48:4. In light of this reliance and the "dwindl[ing]" Superfund dollars, it is more important than ever that PRPs recognize the authority of the EPA and comply with its orders. *See id.* at 44:2–12. Unfortunately, Dico's conduct in this case fell far short of this standard, and, therefore, this factor weighs in favor of assessing a substantial penalty.

---

Trial Br. (Clerk's No. 185) at 41.

4.      *Amount of assessed penalty.*

Plaintiff proposes a civil penalty of $2,216,000.00 calculated pursuant to "a tiered

penalty structure that takes into account periods of Dico's more and less egregious conduct."

Pl.'s Br. at 50.  Specifically, Plaintiff claims that the appropriate daily penalty amount should be

$18,000.00 per day from June 19, 2007 to September 18, 2007 and $8,000.00 per day from

September 19, 2007 to November 27, 2007.  *Id.*  Dico maintains that this proposed penalty

amount is "unprecedented" in light of "the dissimilarities between Dico's conduct and the

egregious conduct exhibited by the defendants" in cases such as *Lecarreaux*, *M. Genzale

Plating*, *Gurley*, and *Barkman*.  Def.'s Br. at 33–34.

The Court disagrees that a two-tier penalty structure[46] is necessary in this case.  Thus,

having determined that the duration of Dico's violations was 162 days, the Court now turns to

---

[46]      The reason Plaintiff proposes a two-tier penalty structure is to "take[] into account periods of Dico's more and less egregious conduct."  Pl.'s Br. at 50.  Under this approach, Plaintiff suggests a higher penalty for the first ninety-two days because "Dico kept [the] EPA ignorant of the building demolition" during that time.  *Id.*  As for the remaining seventy days of non-compliance, Plaintiff claims that Dico's conduct was less egregious because the EPA had notice of the building demolition, but "Dico failed to halt breaching of the encapsulation and failed to prevent, abate, or minimize [PCB] releases at the Dico site."  *Id.*  The Court cannot agree that Dico's conduct after the September 19, 2007 EPA site visit at the Dico property was less egregious.  Indeed, at the time of this site visit, Dico knew that SIM had purchased some of the regulated buildings, *see* Exs. 1026–29, but chose not to provide that information to Peterson during her visit, *see* Trial Tr. at 76:5–77:12.  Thus, instead of being forthcoming and cooperative with the EPA, Dico waited for the EPA's November 8, 2007 formal letter requesting information regarding, among other things, the identity of the purchaser and the location of the building materials, *see* Ex. 42 at 2, and then waited until January 22, 2008 to provide its response, even though Dico knew all along that it had sold the buildings to SIM, *see* Order (Clerk's No. 128) at 22.  Dico's lack of cooperation caused the EPA to spend additional Superfund money to try and find the building materials, whose location was either known, or readily ascertainable to Dico, and also prevented the EPA from allocating such resources to other Superfund sites.  Furthermore, Dico's delay in disclosing to the EPA the identity of the purchaser of the regulated buildings impeded the Agency's ability to institute a timely removal action at the SIM site.  This behavior can hardly be labeled "less egregious."

deciding the proper daily penalty amount.  After applying the five-factor test above to the facts

of this case, the Court concludes that the appropriate daily penalty is $10,000.00,[47] which

amounts to a total penalty of $1,620,000.00.[48]  The Court finds that this penalty amount is both

warranted by Dico's reprehensible conduct and also sufficient to carry out the main purpose of

CERCLA civil penalties—deterrence.

### B.  *Punitive Damages*

In its March 6, 2013 summary judgment ruling, the Court concluded that Dico was liable

for punitive damages.  Order (Clerk's No. 128) at 41–42.  Therefore, Dico may face "punitive

damages in an amount at least equal to, and not more than three times, the amount of any costs

incurred by the Fund."  42 U.S.C. § 9607(c)(3).  Although the Court has discretion whether to

award any punitive damages, if it decides to do so, its discretion is somewhat limited as to the

amount of such damages, i.e., the award must be at least equal to but no more than three times

the amount of funds that the Superfund incurred as a result of Dico's violations of the 1994

Building UAO.  *See id.*; *see also United States v. Capital Tax Corp. et al.*, No. 04 C 4138, 2007

U.S. Dist. LEXIS 56243, at *37–38 (N.D. Ill. Aug. 1, 2007).  "The discretionary element

contained in the statute (i.e., the discretion to award between one and three times the response

costs) suggests that the nature of a defendant's conduct[49] may be relevant in assessing punitive

---

[47]     This daily penalty amount already reflects an appropriate discount in consideration of
Dico's apparent inability to pay any adverse judgment.  Because, however, on balance, the five-
factor test employed by the Court suggests that a substantial civil penalty is appropriate in this
case, the daily penalty amount after applying this discount is properly set at $10,000.00.

[48]     162 days x $10,000.00 per day = $1,620,000.00.

[49]     Financial insolvency is not a mitigating factor in the punitive damages context.  *See
United States v. Lecarreaux*, No. 90–1672 1992 WL 108816, at *14 (D.N.J. Feb. 19, 1992)

damages." *Lecarreaux*, 1992 U.S. Dist. LEXIS 9365, at *36–37.  At the very least, Dico's conduct described above, *see supra* pp. 6–9, warrants a punitive damages award that is equal to one time the amount of Plaintiff's response costs, or $1,477,787.73.[50]

## IV.  CONCLUSION

For the foregoing reasons, the Court imposes $1,620,000.00 in civil penalties and $1,477,787.73 in punitive damages against Dico.

The Clerk of Court is hereby directed to enter judgment:  (1) holding Dico and Titan Tire jointly and severally liable as arrangers (*see* Clerk's No. 119); (2) holding Dico and Titan Tire liable for $1,477,787.73 in response costs incurred in connection with the SIM site, which figure represents response costs already incurred and reported by Plaintiff (*see* Clerk's No. 128; *see also supra* n.50); (3) holding Dico liable for civil penalties and punitive damages (*see* Clerk's No. 128); and (4) against Dico in the amount of $3,097,787.73 representing the civil penalties and punitive damages imposed in this case.  Furthermore, Plaintiff shall be allowed to recover its costs incurred in this action.  *See* Compl. (Clerk's No. 1) at 14.

Additionally, Plaintiff is entitled to a declaratory judgment against Dico and Titan Tire holding them liable for all response costs already incurred but not reported by Plaintiff, as well

---

(concluding that if financial insolvency were a mitigating factor, "potential violators w[ould] know that they can ultimately escape Section 107(c)(3)'s punitive mandate by showing an inability to pay," which would undermine "Section 107(c)(3)'s deterrent purpose[, i.e.,] . . . to send a message to the regulated community regarding the need to understand and plan for potential environmental catastrophe").

[50]      This figure is comprised of EPA costs in the amount of $91,727.51 (as of October 31, 2009), prejudgment interest in the amount of $1,077.64 (as of May 12, 2012), and Department of Justice costs in the amount of $1,384,982.58 (as of April 6, 2013).  *See* Order (Clerk's No. 128) at 12; Ex. 1022.

as all future response costs that Plaintiff may incur, in connection with the SIM site removal

action.  *See* Compl. at 14; Clerk's No. 128 at 43.  Therefore, the Court retains jurisdiction over

the issue of these additional response costs.  Once Plaintiff's involvement with the SIM site is

complete, Plaintiff shall file a motion with the Court seeking to recover these additional response

costs.

     IT IS SO ORDERED.

     Dated this ____24th___ day of February, 2014.

_____
ROBERT W. PRATT
U.S. DISTRICT JUDGE